IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

PHILIP M. MONIER,
　　　　Petitioner,

v.　　　　　　　　　　　　　　Case No.: 3:16cv174/MCR/EMT

JULIE JONES,
　　　　Respondent.
_____

## <u>ORDER, REPORT AND RECOMMENDATION</u>

This cause is before the court on Petitioner's amended petition for writ of habeas corpus filed pursuant to 28 U.S.C. § 2254 (ECF No. 7). Respondent filed an answer and relevant portions of the state court record (ECF No. 33).[1] Petitioner filed a reply (ECF No. 55).

The case was referred to the undersigned for the issuance of all preliminary orders and any recommendations to the district court regarding dispositive matters. *See* N.D. Fla. Loc. R. 72.2(B); *see also* 28 U.S.C. § 636(b)(1)(B), (C) and Fed. R. Civ. P. 72(b). After careful consideration of all issues presented by the parties, it is the opinion of the undersigned that the pleadings and attachments before the court show that Petitioner is not entitled to federal habeas relief.

_____

[1] Respondent initially filed a motion to dismiss, which was denied (ECF Nos. 19, 22, 24).

I.      BACKGROUND & PROCEDURAL HISTORY

The procedural background of this case is established by the state court record (ECF No. 19).[2]  Petitioner was tried before a jury in the Circuit County in and for Escambia County, Florida, Case No. 2010-CF-4918, on one count of burglary of a dwelling while armed with a firearm (Count One); two counts of aggravated assault by threat with a firearm and while in actual possession of a firearm (Counts Two and Three); one count of kidnapping while in actual possession of a firearm (Count Four); four counts of attempted felony murder of a law enforcement officer with actual possession and discharge of a firearm during the commission thereof by a convicted felon (Counts Five-Eight); one count of possession of a firearm by a convicted felon (Count Nine); and one count of possession of a controlled substance (Count Ten) (Ex. A at 1-3, Ex. C).  Petitioner entered a plea as charged to Count Ten, and the State nolle prossed Count Nine.  The jury returned a guilty verdict of a lesser offense of armed trespass on Count One and guilty as charged on Counts Two through Eight (Ex. B at 228–39).

_____

[2] Hereinafter all citations to the state court record refer to the electronically filed exhibits to Respondent's motion to dismiss (ECF No. 19) unless otherwise indicated.  Additionally, if a page has more than one page number, the court cites to the "Bates stamp" page number.

Case No.: 3:16cv174/MCR/EMT

The state court sentenced Petitioner to a term of life imprisonment without parole on each of the attempted felony murder counts, a term of ten (10) years in prison on the kidnapping count, and a term of five (5) years in prison on each of the remaining four counts, with all sentences to run consecutively with no pre-sentence jail credit (Ex. B at 241–57). Petitioner appealed the judgment to the Florida First District Court of Appeal ("First DCA"), Case No. 1D12-529 (*see* Ex. B at 266, Ex. D). Petitioner's counsel field a brief, pursuant to *Anders v. California*, 386 U.S. 738 (1967), asserting that there were no meritorious arguments to support the contention that reversible error occurred in the trial court (Ex. D). Petitioner filed a pro se initial brief (Ex. E), and the First DCA affirmed the judgment per curiam without written opinion on July 15, 2013 (Ex. F). *Monier v. State*, 117 So. 3d 1092 (Fla. 1st DCA 2013) (Table). The mandate issued August 12, 2013 (Ex. G).

On October 10, 2014, Petitioner filed a motion for post-conviction relief, pursuant to Rule 3.850 of the Florida Rules of Criminal Procedure (Ex. H at 1–72). The state circuit court summarily denied the Rule 3.850 motion on September 9, 2015 (*id*. at 461–62, 467–72). Petitioner appealed the decision to the First DCA, Case No. 1D15-4944 (Ex. H at 792–94, Ex. J). On March 14, 2016, the First DCA affirmed the lower court's decision per curiam without written opinion (Ex. L). *Monier v. State*,

187 So. 3d 1237 (Fla. 1st DCA 2016) (Table).  The mandate issued April 11, 2016 (Ex. M).

Petitioner filed an initial petition for a writ of habeas corpus in this court, which was signed on April 18, 2016, and docketed on April 21, 2016 (ECF No. 1). Petitioner then filed a motion for leave to file an amended petition and an amended petition, which was docketed on June 23, 2016, and which the court granted (ECF Nos. 6, 7, 9).  Respondent filed a motion to dismiss contending that the initial petition was untimely (ECF No. 19).  The court denied Respondent's motion after determining that Petitioner's initial petition was timely filed pursuant to the prison mailbox rule (ECF Nos. 22, 24).  The amended petition is now ripe for adjudication.

## II.    STANDARD OF REVIEW

Federal courts may grant habeas corpus relief for persons in state custody pursuant to 28 U.S.C. § 2254.  Pub. L. 104-132, § 104, 110 Stat. 1214, 1218–19. Section 2254(d) provides, in relevant part:

> (d)  An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> > (1)  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2)  resulted in a decision that was based on an unreasonable
determination of the facts in light of the evidence presented in the
State court proceeding.

28 U.S.C. § 2254(d).

The United States Supreme Court explained the framework for § 2254 review

in *Williams v. Taylor*, 529 U.S. 362, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000).  The

appropriate test was described by Justice O'Connor as follows:

> Under the "contrary to" clause, a federal habeas court may grant the writ
> if the state court arrives at a conclusion opposite to that reached by this
> court on a question of law or if the state court decides a case differently
> than this Court has on a set of materially indistinguishable facts.  Under
> the "unreasonable application" clause, a federal habeas court may grant
> the writ if the state court identifies the correct governing legal principle
> from this Court's decisions but unreasonably applies that principle to the
> facts of the prisoner's case.

*Id.*, 529 U.S. at 412–13 (O'Connor, J., concurring).

Employing the *Williams* framework, on any issue presented in a federal habeas

petition upon which there has been an adjudication on the merits in a state court

proceeding, the federal court must first ascertain the "clearly established Federal law,"

namely, "the governing legal principle or principles set forth by the Supreme Court

at the time the state court render[ed] its decision."  *Lockyer v. Andrade*, 538 U.S. 63,

71–72 (2003).  The law is "clearly established" only when a Supreme Court holding

at the time of the state court decision embodies the legal principle at issue. *See Thaler v. Haynes*, 559 U.S. 43, 47 (2010); *Woods v. Donald*, — U.S. —, 135 S. Ct. 1372, 1376 (2015) ("We have explained that clearly established Federal law for purposes of § 2254(d)(1) includes only the holdings, as opposed to the dicta, of this Court's decisions." (internal quotation marks and citation omitted)).

After identifying the governing legal principle(s), the federal court determines whether the state court adjudication is contrary to the clearly established Supreme Court case law. The adjudication is not contrary to Supreme Court precedent merely because it fails to cite to that precedent. Rather, the adjudication is "contrary" only if either the reasoning or the result contradicts the relevant Supreme Court holdings. *Early v. Packer*, 537 U.S. 3, 8 (2002) ("Avoiding th[e] pitfalls [of § 2254(d)(1)] does not require citation to our cases—indeed, it does not even require awareness of our cases, so long as neither the reasoning nor the result of the state-court decision contradicts them."). Where there is no Supreme Court precedent on point, the state court's conclusion cannot be contrary to clearly established federal law. *See Woods*, 135 S. Ct. at 1377 (holding, as to claim that counsel was per se ineffective in being absent from the courtroom for ten minutes during testimony concerning other defendants: "Because none of our cases confront the specific question presented by

this case, the state court's decision could not be contrary to any holding from this Court." (internal quotation marks and citation omitted)).  If the state court decision is contrary to clearly established federal law, the federal habeas court must independently consider the merits of the petitioner's claim.  *See Panetti v. Quarterman*, 551 U.S. 930, 954, 127 S. Ct. 2842, 168 L. Ed. 2d 662 (2007).

If the "contrary to" clause is not satisfied, the federal habeas court next determines whether the state court "unreasonably applied" the governing legal principles set forth in the Supreme Court's holdings.  The federal court defers to the state court's reasoning unless the state court's application of the legal principle(s) was "objectively unreasonable" in light of the record before the state court.  *Williams*, 529 U.S. at 409; *see Holland v. Jackson*, 542 U.S. 649, 652, 124 S. Ct. 2736, 159 L. Ed. 2d 683 (2004) (per curiam).  In applying this standard, the Supreme Court has emphasized:

> When reviewing state criminal convictions on collateral review, federal judges are required to afford state courts due respect by overturning their decisions only when there could be no reasonable dispute that they were wrong.  Federal habeas review thus exists as "a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal."  *Harrington*, *supra*, at 102–103, 131 S. Ct. 770 (internal quotation marks omitted).

*Woods*, 135 S. Ct. at 1376 (quoting *Harrington v. Richter*, 562 U.S. 86, 131 S. Ct. 770, 178 L. Ed. 2d 624 (2011)).

Section 2254(d) also allows federal habeas relief for a claim adjudicated on the merits in state court where that adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). The "unreasonable determination of the facts" standard is implicated only to the extent the validity of the state court's ultimate conclusion is premised on an unreasonable fact finding. *See Gill v. Mecusker*, 633 F.3d 1272, 1292 (11th Cir. 2011). As with the "unreasonable application" clause, the federal court applies an objective test. *Miller-El v. Cockrell*, 537 U.S. 322, 340, 123 S. Ct. 1029, 154 L. Ed. 2d 931 (2003) (holding that a state court decision based on a factual determination "will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state court proceeding."). Federal courts "may not characterize . . . state-court factual determinations as unreasonable merely because we would have reached a different conclusion in the first instance." *Brumfield v. Cain*, — U.S. —, 135 S. Ct. 2269, 2277, 192 L. Ed. 2d 356 (2015) (quotation marks omitted).

When performing review under § 2254(d), the federal court presumes that all factual determinations made by the state court are correct.  28 U.S.C. § 2254(e)(1). The petitioner bears "the burden of rebutting the presumption of correctness by clear and convincing evidence."  *Id.*  Neither the Supreme Court nor the Eleventh Circuit has interpreted how § 2254(d)(2) and § 2254(e)(1) interact in the context of fact-based challenges to state court adjudications.  *See Cave v. Sec'y for Dep't of Corr.*, 638 F.3d 739 (11th Cir. 2011).  However, the Eleventh Circuit has declined to grant habeas relief under § 2254(d)(2) in the context of a state appellate court's summary affirmance, where it found that the validity of the state court decision was not premised on the trial court's unreasonable fact finding, and that the petitioner failed to demonstrate "by clear and convincing evidence that the record reflect[ed] an insufficient factual basis for affirming the state court's decision."  *Gill*, 633 F.3d at 1292.

Only if the federal habeas court finds that the petitioner satisfied § 2254(d), does the court take the final step of conducting an independent review of the merits of the petitioner's claims.  *See Panetti*, 551 U.S. at 954.  Even then, the writ will not issue unless the petitioner shows that he is in custody "in violation of the Constitution

or laws and treaties of the United States." 28 U.S.C. § 2254(a). "If this standard is difficult to meet, that is because it was meant to be." *Richter*, 562 U.S. at 102.

Within this framework, the court will review Petitioner's claims.

## III.   PETITIONER'S CLAIMS

Ground I:   "Deprivation of Rights as Secured by the Sixth and Fourteenth Amendments to the United States Constitution by the Appellate Court's Affirmance of the Lower Court's Abuse of its Discretion and/or Error by Failing to Hear Argument and Testimony and Enter an Order for Change of Venue, Prior to Appellant Proceeding to Trial"

In his first ground for relief, Petitioner alleges that although his trial counsel filed a pretrial motion for a change of venue and the trial court set aside time to hear pretrial motions, the court did not allow Petitioner to present evidence in support of the motion. Instead, the trial court took the motion under advisement, but never ruled on it. Petitioner alleges that in failing to address or rule on the motion the court abused its discretion (ECF No. 7 at 7). Respondent argues that Petitioner failed to exhaust this claim in state court, thus he is barred from pursuing the claim in federal court (ECF No. 33 at 23-25).

   1.   Clearly Established Supreme Court Law

It is a long-standing prerequisite to the filing of a federal habeas corpus petition that the petitioner have exhausted available state court remedies, 28 U.S.C.

§ 2254(b)(1),[3] thereby giving the State the "'opportunity to pass upon and correct' alleged violations of its prisoners' federal rights." *Duncan v. Henry*, 513 U.S. 364, 365, 115 S. Ct. 887, 130 L. Ed. 2d 865 (1995) (quoting *Picard v. Connor*, 404 U.S. 270, 275, 92 S. Ct. 509, 30 L. Ed. 2d 438 (1971) (citation omitted)). To satisfy the exhaustion requirement, the petitioner must "fairly present" his claim in each appropriate state court, alerting that court to the federal nature of the claim. *Duncan*, 513 U.S. at 365–66; *O'Sullivan v. Boerckel*, 526 U.S. 838, 845, 119 S. Ct. 1728, 144 L. Ed. 2d 1 (1999); *Picard*, 404 U.S. at 277–78.

The Supreme Court has offered the following guidance for determining whether a habeas petitioner has met the "fair presentation" requirement. In *Picard v. Connor*, the Court held that, for purposes of exhausting state remedies, a claim for relief in habeas corpus must include reference to a specific federal constitutional guarantee, as

---

[3] Section 2254 provides, in pertinent part:

(b)(1)  An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that–
    (A)  the applicant has exhausted the remedies available in the courts of the State; or
        (B) (i)  there is an absence of available State corrective process; or
          (ii)  circumstances exist that render such process ineffective to protect the rights of the applicant.
. . . .
(c)  An applicant shall not be deemed to have exhausted the remedies available in the courts of the State, within the meaning of this section, if he has the right under the law of the State to raise, by any available procedure, the question presented.

well as a statement of the facts which entitle the petitioner to relief.  404 U.S. at 277.

In announcing that "the substance of a federal habeas corpus claim must first be presented to the state courts," *id.*, 404 U.S. at 278, the Court rejected the contention that the petitioner satisfied the exhaustion requirement by presenting the state courts only with the facts necessary to state a claim for relief.

Additionally, the Court has indicated that it is insufficient to make a general appeal to a constitutional guarantee as broad as due process to present the "substance" of such a claim to a state court.  In *Anderson v. Harless*, 459 U.S. 4, 103 S. Ct. 276, 74 L. Ed. 2d 3 (1982), the habeas petitioner was granted relief on the ground that a jury instruction violated due process because it obviated the requirement that the prosecutor prove all the elements of the crime beyond a reasonable doubt.  *Id.* 459 U.S. at 7 (citing *Sandstrom v. Montana*, 442 U.S. 510, 99 S. Ct. 2450, 61 L. Ed. 2d 39 (1979)).  The only manner in which the habeas petitioner cited federal authority was by referring to a state court decision in which "the defendant . . . asserted a broad federal due process right to jury instructions that properly explain state law." *Anderson*, 459 U.S. at 7.  The Court expressed doubt that a defendant's citation to a state-court decision predicated solely on state law was sufficient to fairly apprise a reviewing court of a potential federal claim merely because the defendant in the cited

case advanced a federal claim. *Id.*, 459 U.S. at 7 & n.3. Furthermore, the Court clarified that such a citation was obviously insufficient when the record satisfied the federal habeas court that the federal claim asserted in the cited case was not the same as the federal claim on which federal habeas relief was sought. *Id.*

Years later, the Supreme Court readdressed the "fair presentation" requirement in *Duncan v. Henry*, 513 U.S. 364. The *Duncan* Court strictly construed the exhaustion requirement so as to mandate that, if state and federal constitutional law overlap in their applicability to a petitioner's claim, the petitioner must raise his issue in terms of the applicable federal right in state court in order to obtain federal review of the issue.[4] The Supreme Court explained, "[i]f a habeas petitioner wishes to claim that an evidentiary ruling at a state court trial denied him the due process of law guaranteed by the Fourteenth Amendment, he must say so, not only in federal, but in state court." *Duncan*, 513 U.S. at 365–66.

In *Baldwin v. Reese*, the Supreme Court again focused upon the requirement of "fair presentation," holding that "ordinarily a state prisoner does not 'fairly present' a claim to a state court if that court must read beyond a petition or a brief (or a similar

---

[4] The petitioner in *Duncan* raised a federal due process claim in his habeas petition, but had raised only a state constitutional claim in his state appeal. Presented with a state constitutional claim, the state court applied state law in resolving the appeal.

document) that does not alert it to the presence of a federal claim in order to find

material, such as a lower court opinion in the case, that does so." 541 U.S. 27, 32, 124

S. Ct. 1347, 158 L. Ed. 2d 64 (2004). The *Baldwin* Court commented that "a litigant

wishing to raise a federal issue can easily indicate the federal law basis for his claim

in a state-court petition or brief, for example, by citing in conjunction with the claim

the federal source of law on which he relies or a case deciding such a claim on federal

grounds, or by simply labeling the claim 'federal.'" *Id.*, 541 U.S. at 32. With regard

to this statement, the Eleventh Circuit stated in *McNair v. Campbell*, 416 F.3d 1291

(11th Cir. 2005):

> If read in a vacuum, this dicta might be thought to create a low floor
> indeed for petitioners seeking to establish exhaustion. However, we
> agree with the district court that this language must be "applied with
> common sense and in light of the purpose underlying the exhaustion
> requirement[:] 'to afford the state courts a meaningful opportunity to
> consider allegations of legal error without interference from the federal
> judiciary.'" *McNair* [*v. Campbell*], 315 F. Supp. 2d at 1184 (quoting
> *Vasquez v. Hillery*, 474 U.S. 254, 257, 106 S. Ct. 617, 620, 88 L. Ed. 2d
> 598 (1986)). This is consistent with settled law established by the
> Supreme Court. . . . We therefore hold that "'[t]he exhaustion doctrine
> requires a habeas applicant to do more than scatter some makeshift
> needles in the haystack of the state court record.'"

416 F.3d at 1302–03 (citations omitted).[5]

---

[5] In his initial brief before the Court of Criminal Appeals, the petitioner cited one federal
case in a string citation containing other state cases, and in a closing paragraph in his argument that
extraneous materials were considered by the jury during deliberations, stated that there was a

An issue that was not properly presented to the state court and which can no longer be litigated under state procedural rules is considered procedurally defaulted, *i.e.*, procedurally barred from federal review. *Bailey v. Nagle*, 172 F.3d 1299, 1302–03 (11th Cir. 1999). This court will also consider a claim procedurally defaulted if it was presented in state court and rejected on the independent and adequate state ground of procedural bar or default. *See Coleman v. Thompson*, 501 U.S. 722, 734–35 & n.1, 111 S. Ct. 2546, 115 L. Ed. 2d 640 (1991); *Caniff v. Moore*, 269 F.3d 1245, 1247 (11th Cir. 2001) ("[C]laims that have been held to be procedurally defaulted under state law cannot be addressed by federal courts."); *Chambers v. Thompson*, 150 F.3d 1324, 1326–27 (11th Cir. 1998) (applicable state procedural bar should be enforced by federal court even as to a claim which has never been presented to a state court); *accord Tower v. Phillips*, 7 F.3d 206, 210 (11th Cir. 1993); *Parker v. Dugger*, 876 F.2d 1470 (11th Cir. 1990), *rev'd on other grounds*, 498 U.S. 308, 111 S. Ct. 731, 112 L. Ed. 2d 812 (1991). In the first instance, the federal court must determine whether any future attempt to exhaust state remedies would be

---

violation of his rights "protected by the Fifth, Sixth, Eighth[,] and Fourteenth Amendments to the United States Constitution, the Alabama Constitution[,] and Alabama law." *McNair v. Campbell*, 416 F.3d 1291, 1303 (11th Cir. 2005). The court found that these references to federal law were not sufficient to meet the fair presentment requirement and noted that it was important that the petitioner had never mentioned the federal standards regarding extraneous materials in his brief, but relied on state law for his arguments. *Id.*

futile under the state's procedural default doctrine.  *Bailey*, 172 F.3d at 1303.  In the second instance, a federal court must determine whether the last state court rendering judgment clearly and expressly stated its judgment rested on a procedural bar.  *Id*.  A federal court is not required to honor a state's procedural default ruling unless that ruling rests on adequate state grounds independent of the federal question.  *See Harris v. Reed*, 489 U.S. 255, 109 S. Ct. 1038, 103 L. Ed. 2d 308 (1989).  The adequacy of a state procedural bar to the assertion of a federal question is itself a federal question.  *Lee v. Kemna*, 534 U.S. 362, 122 S. Ct. 877, 151 L. Ed. 2d 820 (2002).

The Eleventh Circuit has set forth a three-part test to determine whether a state court's procedural ruling constitutes an independent and adequate state rule of decision.  *Judd v. Haley*, 250 F.3d 1308, 1313 (11th Cir. 2001).  First, the last state court rendering judgment must clearly and expressly state it is relying on state procedural rules to resolve the federal claim.[6]  *Id*.  Second, the state court's decision on the procedural issue must rest entirely on state law grounds and not be intertwined with an interpretation of federal law.  *Id*.  Third, the state procedural rule must be adequate.  *Id*.  The adequacy requirement has been interpreted to mean the rule must

---

[6] The federal court should honor the procedural bar even if the state court alternatively reviewed the claim on the merits.  *Marek v. Singletary*, 62 F.3d 1295, 1302 (11th Cir. 1995); *Alderman v. Zant*, 22 F.3d 1541, 1549 (11th Cir. 1994).

be firmly established and regularly followed, that is, not applied in an arbitrary or unprecedented fashion. *Id.*

To overcome a procedural default, the petitioner must show cause and prejudice or a fundamental miscarriage of justice in order for the federal habeas court to reach the merits of a claim. *Tower*, 7 F.3d at 210; *Parker*, 876 F.2d 1470. "For cause to exist, an external impediment, whether it be governmental interference or the reasonable unavailability of the factual basis for the claim, must have prevented petitioner from raising the claim." *McCleskey v. Zant*, 499 U.S. 467, 497, 111 S. Ct. 1454, 113 L. Ed. 2d 517 (1991) (quoting *Murray v. Carrier*, 477 U.S. 478, 488, 106 S. Ct. 2639, 91 L. Ed. 2d 397 (1986)). To satisfy the miscarriage of justice exception, the petitioner must show that "a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Schlup v. Delo*, 513 U.S. 298, 327, 115 S. Ct. 85, 130 L. Ed. 2d 808 (1995). "To establish the requisite probability, the petitioner must show that it is more likely than not that no reasonable juror would have convicted him." *Schlup*, 513 U.S. at 327. Further:

> a substantial claim that constitutional error has caused the conviction of an innocent person is extremely rare. To be credible, such a claim requires [a] petitioner to support his allegations of constitutional error with new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial.

*Id.* Although a habeas petitioner asserting a convincing claim of actual innocence need not prove diligence to overcome a procedural bar, timing is a factor relevant in evaluating the reliability of a petitioner's proof of innocence. *See McQuiggin v. Perkins*, 569 U.S. 383, 133 S. Ct. 1924, 1935, 185 L. Ed. 2d 1019 (2013). As the Court stated in *Schlup*, "[a] court may consider how the timing of the submission and the likely credibility of [a petitioner's] affiants bear on the probable reliability of . . . evidence [of actual innocence]." 513 U.S. at 332; *see also House v. Bell*, 547 U.S. 518, 537, 126 S. Ct. 2064, 165 L. Ed. 2d 1 (2006).

> 2.    Federal Review of State Court Decision

The record reflects that on December 30, 2011, defense counsel filed a motion for a change of venue pursuant to Florida Rule of Criminal Procedure 3.240 and Article I, Sections 9, 16 and 22 of the Florida Constitution (Ex. A at 37–198). No hearing on the motion was transcribed for purposes of appeal; however, a clerk's docket sheet dated January 5, 2012, states at the bottom, "Defense motion to change venue–under advisement" (Ex. R). The record does not contain an order ruling on the motion. As part of a pro se motion to supplement the record in Petitioner's appeal with a transcript of a hearing conducted on January 13, 2012, the clerk of the circuit

court filed a notice that no order on the motion for a change of venue appeared in the record (Ex. P).

In his 3.850 post-conviction motion, Petitioner raised a related ineffective assistance of counsel claim asserting that his counsel was ineffective for failing to request a ruling on the defense's motion for a change of venue (Ex. H at 67–71). However, Petitioner did not raise a claim of trial court error with regard to the motion for a change of venue (*see* Ex. D).

There is no dispute that the trial court did not rule on the motion for a change of venue. Because Petitioner failed to obtain a timely ruling, he is considered to have waived the matter for appellate purposes under Florida law. *See Reaves v. Crosby*, 837 So. 2d 396, 398 (Fla. 2003) ("Defense counsel did not pursue the matter further, so this issue was not preserved for appeal."); *Armstrong v. State*, 642 So. 2d 730, 740 (Fla. 1994) ("The trial judge reserved ruling on this issue and apparently never issued a ruling. Consequently, this issue is procedurally barred."). Pursuant to the procedural default doctrine, a state prisoner seeking federal habeas relief who failed to raise the claim in state court is barred from pursuing the claim in federal court. Petitioner would need to demonstrate cause and resulting prejudice to overcome the procedural default.

In Petitioner's reply, however, he states that "after further research and review, Petitioner must concede that no error occurred" (ECF No. 55 at 2). Due to this concession and the fact that Petitioner has not established cause or resulting prejudice to overcome the default, this claim is procedurally defaulted and barred from review. Accordingly, Petitioner is not entitled to habeas relief on this ground.

Ground II:    "Deprivation of Rights as Secured by the Sixth and Fourteenth Amendments to the United States Constitution Through the Lower Tribunal's Failure to Independently Rule on Timely Amended 3.850 Motion for Post-Conviction Relief"

In his second ground for relief, Petitioner alleges that the state post-conviction court failed to rule on his timely filed amended post-conviction motion in violation of the Sixth and Fourteenth Amendments (ECF No. 7 at 9). Respondent argues that Petitioner's claim is not cognizable for habeas corpus relief because the claim represents an attack on a proceeding collateral to Petitioner's confinement and not on the confinement itself (ECF No. 33 at 27–28). *See Quince v. Crosby*, 360 F.2d 1259, 1261–62 (11th Cir. 2004) (explaining that "while habeas relief is available to address defects in a criminal defendant's conviction and sentence, an alleged defect in a collateral proceeding does not state a basis for relief.").

In his reply, Petitioner concedes that "it affirmatively appears that Respondent's position on this Ground is correct" (ECF No. 55 at 2). The undersigned agrees. Accordingly, Petitioner is not entitled to habeas relief on this ground.

Ground III:  Ineffective Assistance of Counsel: "Error in Conceding to the Court's Response to a Jury Question During Deliberations"

In his third ground for relief, Petitioner alleges that his trial counsel was ineffective in failing to object to the way the trial court responded to a question raised by the jury during deliberations (ECF No. 7 at 11–12). Specifically, the jury asked to have transcripts provided for the testimony of the two victims, Jacqueline Rosenbloom and Brittney Ralleo. In response, the court stated that it would be inclined to advise the jury to rely on their own memories, which the State and defense conceded would be the appropriate response. Petitioner argues that in light of the fact that the jury found him guilty of armed trespassing, a lesser included offense to armed burglary, they "didn't believe either State's witness," and it is possible that the jury would have exercised their "pardon power even further by finding [him] guilty of other lesser included offenses or even not guilty" (ECF No. 55 at 2–3). Petitioner alleges that his counsel's deficient performance in not requesting a read-back of the witnesses' testimony to the jury resulted in prejudice to his case.

1.    Clearly Established Federal Law

The standard for evaluating claims of ineffective assistance of counsel is set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). To obtain relief under *Strickland*, Petitioner must show (1) deficient performance by counsel, and (2) a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different. *Id.* at 687–88. If Petitioner fails to make a showing as to either performance or prejudice, he is not entitled to relief. *Id.* at 697.

The focus of inquiry under the performance prong of *Strickland* is whether counsel's assistance was reasonable considering all the circumstances and under prevailing professional norms. *Strickland*, 466 U.S. at 688–89, 691. "The petitioner's burden to prove, by a preponderance of the evidence, that counsel's performance was unreasonable is a heavy one." *Jones v. Campbell*, 436 F.3d 1285, 1293 (11th Cir. 2006) (citing *Chandler v. United States*, 218 F.3d 1305, 1313 (11th Cir. 2000) (en banc)). "Judicial scrutiny of counsel's performance must be highly deferential," and courts should make every effort to "eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689. "[T]here are no 'absolute rules' dictating what reasonable performance is . . . ."

*Michael v. Crosby*, 430 F.3d 1310, 1320 (11th Cir. 2005) (quoting *Chandler*, 218 F.3d at 1317). Indeed, "'[a]bsolute rules would interfere with counsel's independence—which is also constitutionally protected—and would restrict the wide latitude counsel have in making tactical decisions.'" *Id.* (quoting *Putman v. Head*, 268 F.3d 1223, 1244 (11th Cir. 2001)).

If the record is not complete regarding counsel's actions, "then the courts should presume 'that what the particular defense lawyer did at trial—for example, what witnesses he presented or did not present—were acts that some lawyer might do.'" *Jones*, 436 F.3d at 1293 (citing *Chandler*, 218 F.3d at 1314–15 n.15). "Even if many reasonable lawyers would not have done as defense counsel did at trial, no relief can be granted on ineffectiveness grounds unless it is shown that no reasonable lawyer, in the circumstances, would have done so." *Rogers v. Zant*, 13 F.3d 384, 386 (11th Cir. 1994).

As to the prejudice prong of the *Strickland* standard, Petitioner's burden of demonstrating prejudice is high. *See Wellington v. Moore*, 314 F.3d 1256, 1260 (11th Cir. 2002). To establish prejudice, Petitioner must show "that every fair-minded jurist would conclude 'that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Jones*

*v. GDCP Warden*, 753 F.3d 1171, 1184 (11th Cir. 2014) (quoting *Strickland*, 466 U.S. at 694). "A reasonable probability is a probability sufficient to undermine confidence in the outcome," not that counsel's conduct more likely than not altered the outcome of the proceeding. *Id.* (citation omitted). And Petitioner must show that the likelihood of a different result is substantial, not just conceivable. *Williamson v. Fla. Dep't of Corr.*, 805 F.3d 1009, 1016 (11th Cir. 2015) (citing *Richter*, 562 U.S. at 112). "When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Strickland*, 466 U.S. at 695. The prejudice assessment does "not depend on the idiosyncracies of the particular decisionmaker," as the court should presume that the judge or jury acted according to law. *Id.* at 694–95. Further, when the claimed error of counsel occurred at the guilt stage of trial (instead of on appeal), *Strickland* prejudice is gauged against the outcome of the trial, not on appeal. *See Purvis v. Crosby*, 451 F.3d 734, 739 (11th Cir. 2006) (citing *Strickland*, 466 U.S. at 694–95).

Finally, when a district court considers a habeas petition, the state court's findings of historical facts in the course of evaluating an ineffectiveness claim are subject to the presumption of correctness, while the performance and prejudice

components are mixed questions of law and fact. *Strickland*, 466 U.S. at 698; *Collier v. Turpin*, 177 F.3d 1184, 1197 (11th Cir. 1999). "Surmounting *Strickland*'s high bar is never an easy task." *Padilla v. Kentucky*, 559 U.S. 356, 371, 130 S. Ct. 1473, 176 L. Ed. 2d 284 (2010). "Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult." *Richter*, 131 S. Ct. at 788. As the *Richter* Court explained:

> The standards created by *Strickland* and § 2254(d) are both "highly deferential," and when the two apply in tandem, review is "doubly" so. The *Strickland* standard is a general one, so the range of reasonable applications is substantial. Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard.

*Id.* (citations omitted).

### 2.    Federal Review of State Court Decision

Petitioner exhausted this claim in state court. The post-conviction court denied relief, and the First DCA per curiam affirmed the denial. The state circuit court adjudicated the claim as follows:

> Defendant first argues that his attorney was ineffective as a matter of law for not having the testimony of Jacqueline Rosenbloom and Brittney Ralleo read back to the jury after they requested transcripts of their testimony be brought back to the jury room during deliberations. Ms.

Ralleo testified that she lived with her mother, Ms. Rosenbloom, in October of 2010 in Pensacola.  She said she knew Mr. Monier because he had previously dated her mother.  On October 29, 2010, Ms. Ralleo said she came home and saw Mr. Monier arguing with her mother. Defendant pushed his way inside the home and continued to argue with Ms. Rosenbloom.  Her mother then called 911.  Ms. Ralleo said that Defendant had a gun and was waving it around.  As the police entered the home, Ms. Ralleo said Defendant put her mother in a "chokehold position."

Ms. Rosenbloom testified that Defendant was her ex-boyfriend and that the two had known each other for several years.  Defendant told her that he wanted her to go with him to McComb, Mississippi.  When Ms. Rosenbloom would not agree, Defendant then forced his way into her home through the front door.  Ms. Rosenbloom told him to leave, but Defendant refused.  Ms. Rosenbloom testified that she and Ms. Ralleo then locked themselves in the back bedroom.  Ms. Rosenbloom testified that she called the police.  Defendant kicked the bedroom door open as Ms. Rosenbloom was on the phone.

Once the police arrived, Ms. Rosenbloom said that Defendant pulled out his gun.  Ms. Rosenbloom said that she was scared and that Defendant began waving his gun around.  Defendant then placed Ms. Rosenbloom in a "chokehold" and held her in front of him "like a shield" as police entered her home.

Police entered the bedroom with their guns drawn but Defendant did not drop his gun or release Ms. Rosenbloom.  Police ordered Defendant to put his gun down, but he refused to comply with their instructions. A shot was then fired, striking Ms. Rosenbloom in the neck.  Ms. Rosenbloom said she was shot a total of five times.  Eventually, Defendant let her go and she received medical attention for her injuries. The Court finds that Defendant cannot show any prejudice by the fact that the testimony of the two witnesses was not read back to the jury. Both witnesses incriminated Defendant and the Court finds their

> testimony would not have resulted in a different verdict had it been read
> back to them.  This claim, accordingly, is denied.

(Ex. H at 76–77) (citations to record omitted).  The post-conviction court correctly

identified *Strickland* as the Federal law governing this claim (*see id*. at 75–76).

Therefore, Petitioner is entitled to relief only if the state court's adjudication of this

claim was contrary to or an unreasonable application of *Strickland* or was based on

an unreasonable determination of the facts in light of the evidence.  Respondent

argues that the state court determination was correct and that the record supports the

determination.

The record reflects that on direct examination, Ms. Rosenbloom testified that

Petitioner was her ex-boyfriend, and she had known him for seven years (Ex. C at 59).

She testified that she had seen Petitioner a couple of days prior to the incident and he

had wanted her to accompany him to McComb, Mississippi.  Ms. Rosenbloom

refused, but Petitioner returned to her home around 8 a.m. on October 29, 2010, and

again asked her to go with him to McComb (*id*. at 64).  Petitioner was outside the

home, but refused to leave when she asked him to do so.  During this discussion Ms.

Rosenbloom's daughter, Brittney Ralleo, returned home from taking her sister to

school.  Petitioner then became more irate and pushed his way into the home (*id*. at

66).  At that point Ms. Rosenbloom testified that she "panicked basically.  There was

a lot of yelling, telling him to leave. Him telling me he wasn't leaving" (*id*.). At some

point Ms. Rosenbloom's current boyfriend called and when he learned Petitioner was

in her home, he advised her to call the police. Petitioner heard this conversation and

said, according to Ms. Rosenbloom, "[y]ou don't want to call the police. You know

what will happen if you call the police. It won't be pretty. It won't" (*id*. at 67–68).

She tried to locate her car keys so that she could persuade Petitioner to go with her to

the bank or to follow her there, but she could not locate them, so she retreated to her

bedroom with her daughter. At approximately 10 a.m., she called 911 (*id*. at 69).

Petitioner was attempting to coax her out of the bedroom while she continued to ask

him to leave. Then at some point she heard Petitioner leave through her front door

and return through the garage door and "within seconds" Petitioner kicked in her

bedroom door (*id*. at 71). Ms. Rosenbloom testified that upon entering the room,

Petitioner "was frantic, just like all of us were. We panicked. My daughter panicked

because the wood from the door had hit her and we just were begging him to please

leave. You know, don't do this" (*id*. at 72). Petitioner did not pull out his gun until

he heard the police arrive. At this point, Ms. Rosenbloom testified that she and her

daughter were running around her room "trying to get out of his reach" while

Petitioner was waiving his gun around at them (*id*. at 73). She testified that he said

she should not have called the police, that "it is not going to go down pretty" (*id.*).

She was afraid.  When asked what happened next, Ms. Rosenbloom testified:

> As I recall, we heard the police officers coming and the 911 officer told me that they had arrived and when Phil heard the officers' voices coming in things went absolutely haywire at that point and that's when he grabbed me and took me into a chokehold basically and held me in front of him.
>
> My daughter was trying to—she was actually beating on his arm and asking him why and not to do this, please and let her go.  And I was trying to push her out to get her out of harm's way and just tell her to leave.

(*Id.* at 74).  Petitioner was holding Ms. Rosenbloom in front of him like a shield and she was scared.  Ms. Rosenbloom was able to push her daughter and grandson out of the room.  Ultimately three police officers entered the bedroom with their guns drawn and they were yelling loudly for Petitioner to drop his gun.  Ms. Rosenbloom described what happened next as follows:

> They kept demanding that he put his gun down, which he didn't but he had it so that they could see it but it was down on his side.
>
> Phil stated that he wasn't threatening them in any way.  He didn't have the gun pointed at the officers and they said, of course, it doesn't matter, sir, let the gun go.  You still have to release the gun.  He refused to release the gun.  And at that point I saw one of the officers aim the gun and I knew what was coming at that point; Phil knew what was coming at that point.  He was trying to take a shot.

> But Phil was bobbing behind my head and I just kept shaking my head
> no, please, don't because I had a feeling he would miss so that's
> basically what happened.

(*Id*. at 78).  Ms. Rosenbloom was shot in the neck by a deputy.  Petitioner then fired

back at the officers.  He continued to hold Ms. Rosenbloom as he pulled her into the

bathroom.   They both fell down, but Petitioner continued to hold Ms. Rosenbloom

as shots were exchanged (*id.* at 79–80).  The State then played the 911 tape for the

jury.  Ultimately Ms. Rosenbloom was shot five times by police while Petitioner held

her in front of him.  Eventually Petitioner let her go so that she could get medical

treatment.

On  cross-examination,  Ms.  Rosenbloom  was  asked  about  a  ring  that  is

mentioned  on  the  911  tape  which  apparently  Petitioner  wanted  returned  to  him.

Although she stated on the tape that the ring was not in her home, in fact the ring was

there in her safe (*id*. at 101).  Ms. Rosenbloom also acknowledged that she and

Petitioner  had  stayed  in  touch  after  their  break  up.   She  testified  that  she  offered

previously  to  give  the  ring  back,  but  Petitioner  refused  to  take  it.   She  also

acknowledged that Petitioner let Ms. Ralleo leave the bedroom and did not attempt to

keep her there (*id*. at 108).  On the 911 tape Ms. Rosenbloom can be heard asking the

officers to give her a minute to talk to Petitioner because she felt that she could calm

him down and walk him out of the situation (*id*. at 111). The following exchange

clarifies that point:

> Q. [Defense counsel Ron Davis]: You told them that you could walk
> him out of there, didn't you?
> A. [Ms. Rosenbloom]: Yes.
> Q. And you believed you could at that time, didn't you?
> A. I thought I could.
> Q. And Phil also asked them to let you do that, didn't he?
> A. Yes.
> Q. But they didn't do that, did they?
> A. No.
> Q. Instead Deputy Cassady shot you pointblank in the neck, didn't he?
> A. Yes.
> Q. Phil's gun was still at his side pointed down when Deputy Cassady
> shot you, wasn't it?
> A. Yes.
> Q. And up until that point, Phil had never pointed his gun at you, had
> he?
> A. No.
> Q. He never pointed it at the deputies, had he?
> A. No.
> Q. He never threatened to shoot you with his gun, did he?
> A. No.
> Q. He never threatened to shoot the deputies, did he?
> A. No.

(*Id*. at 111–12).

On redirect examination, Ms. Rosenbloom explained why she had kept in touch

with Petitioner after their breakup, testifying that there were different reasons

depending on where they were in the relationship. Petitioner knew she had a

boyfriend, but he would come back and want to reestablish a relationship. She said,

"[i]t would turn into what it always had turned into. He would be controlling and

show up and wanting more than what I could give him" (*id*. at 115). She testified that

she appeased him in order to "keep him at bay" (*id*.). She also testified, "I told him

what I needed to tell him to keep him where he was but if I didn't respond to him, he

would show up at my door" (*id*.). The prosecutor asked about Ms. Rosenbloom's

testimony on cross-examination that she asked the law enforcement officers to let her

walk Petitioner out of the situation:

> Q. [Assistant State Attorney Bridgette Jensen]: So I'm going to direct your attention to that particular line of questioning. And Mr. Davis asked you if Mr. Monier was backed up against the vanity, do you recall that?
> A. [Ms. Rosenbloom]: Yes.
> Q. Was there anything that prevented Mr. Monier from going into your closet?
> A. No.
> Q. Was there anything that prevented Mr. Monier from letting you go?
> A. No.
> Q. Was there anything at that point that prevented Mr. Monier from dropping that gun?
> A. No.
> Q. Now Ms. Rosenbloom, you testified on cross-examination that you felt you could calm Mr. Monier down once the officers got there, is that correct?
> A. Yes.
> Q. Now would it be fair to say that you weren't able to get him out of your front foyer earlier before the police even got there, correct?
> A. Correct.

Q. And when Mr. Davis asked you about Mr. Monier's request for the police officers to let him walk out, do you remember that line of questioning?

A. Yes.

Q. Mr. Monier still had the gun in his hand at that point, did he not?

A. Yes.

Q. And he still had you positioned in front of him?

A. Yes.

Q. Mr. Davis asked you about Deputy Cassady and the shot he fired that hit you?

A. Yes.

Q. Do you remember that?

A. Yes.

Q. And Mr. Davis said that Mr. Monier's hand with the gun was still down by his side, correct?

A. Yes.

Q. Were you holding the defendant's hand down at that point?

A. No.

Q. Was there anything that would have kept Mr. Monier from lifting that gun up and shooting?

A. No.

Q. Was—could he have pulled the gun up and shot you in your head?

A. Could have.

Q. Mr. Davis asked you about the time when Mr. Monier pulled you into the bathroom/shower area, do you recall that line of questioning?

A. Yes.

Q. Okay. Now was there anything that prevented Mr. Monier from pushing you to the floor of the vanity area?

A. No.

Q. Okay. But he still kept a hold around you and held you in front of him, correct?

A. Yes.

***

Q. Before the law enforcement officers arrived, did Mr. Monier have every opportunity to leave your home?

A. Yes.

(*Id.* at 116–19).

Brittney Ralleo testified that she had known Petitioner for about eight years (*id.* at 43). When she returned to her mother's house on the day of the incident after taking her sister to school, she saw Petitioner standing at the front door and arguing with her mother about going to Mississippi (*id.* at 45). Ms. Ralleo testified that her mother asked Petitioner to leave, but he refused. Shortly thereafter, Petitioner pushed his way into the home. Ms. Ralleo testified that after she and her mother went to her mother's bedroom, she heard Petitioner moving around the house. After the 911 call was placed, she heard the garage door open and then very shortly thereafter Petitioner kicked in the bedroom door (*id.* at 49). Ms. Ralleo testified that Petitioner pulled his gun at that point and said, "look what you've done J, look what you've done. I told you not to do this" (*id.*). Petitioner was referring to Ms. Rosenbloom as "J." She testified that he also said, "I told you not to do this. You didn't have to do this. Look what is going to happen now. Just pretty much ranting and raving at that point" (*id.* at 50). He was waving the gun around and once the police entered the home, Ms. Ralleo said Petitioner snatched up her mother. Ms. Ralleo's testimony continued as follows:

> Q. [Assistant State Attorney Jensen]: And when you say he snatched your mom up, what did you mean? Describe what you saw.

A. [Ms. Ralleo]:  He came into the vanity area where we were and took her in a chokehold position.

Q.  And could you see where he had the gun?

A.  It was down by his side.

Q.  And what did you do at that point, Ms. Ralleo?

A.  I was freaking out, yelling at him, telling him to let my mom go.

Q.  Were you still scared?

A.  Yes.

Q.  And what did you do next?

A.  My mom nudged me on my hip to, you know, get out, obviously and I ran out with my son and stuck my hands out of the door to, for the police officers to see me and I told them, you know, don't shoot, don't shoot, I have my son.

***

Q.  What was your emotional state at that time when you saw the law enforcement officers?

A.  Still scared.

Q.  Did you say anything to them as you came down the hallway?

A.  Yes.

Q.  What did you say?

A.  I told them, I told them that he had my mom in there, please go in and help her.  He's going to kill her; he's got a gun.

(*Id*. at 53–54).

On cross-examination, Ms. Ralleo admitted that Petitioner did not point the gun at her or threaten to shoot her (*id*. at 55).  She also acknowledged that she did not hear Petitioner threaten her mother.  Ms. Ralleo testified that she did not see the gun until Petitioner busted into the bedroom and that Petitioner did not try to keep her from leaving the room.  On redirect examination, Ms. Ralleo testified that she was very

scared when Petitioner pulled out the gun and that his waving it around scared both

her and her mother (*id*. at 56).  She was afraid that Petitioner may shoot her.

The record reflects that during deliberations, the jury asked, "[c]an we get a

transcript of testimony of, one, Brittney Ralleo; two, Jacqueline Rosenbloom?"  The

following exchange then occurred:

> [State Attorney Bill Eddins]: Well, Judge, from the State's point of view, we do not feel that that's necessary and would prefer that the Court exercise its judicial discretion and indicate to them that they'll have to rely on their memory, or something to that effect.
>
> [Court]: What I wrote is—just as a possible response to their question is, no, you will have to rely upon your memory of the testimony.
>
> [Eddins]: You have any objection?
>
> [Defense Counsel Davis]: I have no objection to that.  That is my request, as well, Judge.
>
> [Court]: Okay.  That will what will be sent back to them.

(Ex. C at 702).

Petitioner's argument relies on state court decisions holding that it is reversible

error for a trial court to fail to inform a jury of the availability of read-back of

testimony.  *See Hazuri v. State*, 91 So. 3d 836 (Fla. 2012); *State v. Barrow*, 91 So. 3d

826 (Fla. 2012).  These decisions were issued on May 31, 2012, after Petitioner's trial

which was held  on January 17–20, 2012.  As Petitioner acknowledges in his reply,

at the time of his trial there was authority both for and against the proposition that the trial court was not required to advise the jury of the availability of a read-back of testimony. *See*, *e.g.*, *Hazuri v. State*, 23 So. 3d 857 (Fla. 3d DCA 2009); *quashed*, 91 So. 3d 836 (Fla. 2012); *Barrow v. State*, 27 So. 3d 211 (Fla. 4th DCA 2010). However, Petitioner believes that his counsel should have objected based on the Florida Supreme Court's grant of certiorari in *Hazuri* and *Barrow* (ECF No. 55 at 3). Petitioner's argument is not persuasive. Counsel does not render deficient performance by failing to predict subsequent holdings or changes in the law. *Black v. United States*, 373 F.3d 1140, 1144 (11th Cir. 2004); *United States v. Ardley*, 273 F.3d 991, 993 (11th Cir. 2001). Furthermore, a decision by defense counsel not to press for a read-back can also be a reasonable strategy. *See Hendricks v. State*, 34 So. 3d 819, 831 (Fla. 1st DCA 2010) *abrogated on other grounds*, *approved on this ground by Gonzalez v. State*, 136 So. 3d 1125 (Fla. 2014).

In light of the testimony Ms. Rosenbloom and Ms. Ralleo, defense counsel could reasonably have believed that having their testimony read back to the jury would not be in the defense's best interest. What is more, even if this decision was deficient, Petitioner has not demonstrated that but for this error, the outcome of the proceeding would have been different. Both witnesses testified unequivocally that

Petitioner refused to leave the home after being asked to do so repeatedly, waived his gun at both of them, and held Ms. Rosenbloom against her will and as a human shield. Ms. Rosenbloom testified that Petitioner continued to use her as a shield even as he and law enforcement were involved in a shoot out. Given this testimony, it is not more likely than not that the jury would have found Petitioner not guilty of armed trespass, kidnapping, and aggravated assault had this testimony been read back to them. Petitioner has not demonstrated that the state court's adjudication of this claim was contrary to or an unreasonable application of *Strickland* or was based on an unreasonable determination of the facts in light of the evidence. Accordingly, Petitioner is not entitled to habeas relief on this ground.

Ground IV:  Ineffective Assistance of Counsel: "Failure to Request a Jury Instruction For and Argue to the Jury Justifiable Use of Non-Deadly Force"

Ground V:  Ineffective Assistance of Counsel: "Failure to Request Special Jury Instruction *Alternatively* Trial Counsel Was Ineffective for Failing to Object to the Use of Jury Instruction Concerning Police Officer's Use of Force"[7]

In his fourth ground for relief, Petitioner alleges that his trial counsel was ineffective in failing to request a jury instruction that the use of *non-deadly* force is

---

[7] The court has combined these claims for discussion because they are related. It should be noted that the precise nature of the claims raised in Grounds Four and Five is somewhat difficult to discern, so the court has considered the state court record (*e.g.*, Petitioner's Rule 3.850 motion) where appropriate in an effort to better understand the nature of the claims raised in the instant petition.

justified as a defense to a charge of kidnapping (ECF No. 7 at 13–14).  Petitioner argues that he did not exhibit any use of force against Ms. Rosenbloom or Ms. Ralleo prior to the alleged kidnapping, but once the officers arrived he believed he was going to die.  Petitioner contends that the evidence supported a jury instruction on the use of non-deadly force in resisting arrest and had his counsel requested this instruction, the jury would have determined that his actions were justifiable and found him not guilty of kidnapping.  If the jury had determined that Petitioner was not guilty of kidnapping, then Petitioner argues that they would have found that he was justified in using deadly force against the law enforcement officers.  Petitioner also argues that his counsel was ineffective for failing to object to the use of jury instruction 3.6(h), which provides justification for an officer to use force in a situation where the officer is making an arrest.  Petitioner argues that whether the law enforcement officers used excessive force in effectuating his arrest was an issue at the trial.  He believes that the instruction given regarding the use of force in making an arrest confused or misled the jury because there is a distinction between whether an arrest is lawful and whether or not excessive force is used in making that arrest (*see* Petitioner's 3.850 motion, Ex. H at 62–63).

In his fifth ground for relief, Petitioner alleges that his counsel was ineffective for failing to request a special jury instruction on the police's excessive use of force while effectuating his arrest (ECF No. 7 at 16). He argues that his defense to the charges of attempted murder of the police officers was that he was justified in using deadly force because they used excessive force when apprehending him. Petitioner argues that while the jury was instructed to judge his actions by an objective standard, *i.e.*, "that a reasonably cautious and prudent person under the same circumstances would have believed that the danger could have been avoided only through the use of that force," the actions of law enforcement were judged by a subjective standard (*id.*). Petitioner also alleges that counsel was ineffective for failing to object to the jury instruction which was given regarding the justifiable use of force by a law enforcement officer making an arrest.

1.    Clearly Established Supreme Court Law

The *Strickland* standard, set forth *supra*, governs these claims.

2.    Federal Review of State Court Decision

Petitioner exhausted these claims in state court. The post-conviction court denied relief, and the First DCA per curiam affirmed the denial. The state circuit court adjudicated the claims as follows:

Case No.: 3:16cv174/MCR/EMT

Defendant next argues that his attorney was ineffective by failing to request a jury instruction on the justifiable use of non-deadly force as a defense to kidnapping Ms. Rosenbloom.  Where there is evidence introduced at trial which supports the theory of the defense, a defendant is entitled to have the jury instructed on the law applicable to his theory of defense when he so requests.  Here, Defendant kidnapped Ms. Rosenbloom and used her as a human shield against officers to avoid arrest.  Since there was no evidence supporting Defendant's theory of defense, he was not entitled to the instruction and this claim in denied.

Next, defendant claims his attorney erred in failing to request a special instruction concerning the officers' use of force in effectuating his arrest.  The record shows that the jury was given the standard instruction on the justifiable use of force by law enforcement.   Since the standard instruction was proper, the Court finds a special instruction was not required and no prejudice can be shown.  This claim, accordingly, is denied.

(Ex. H at 77) (citations omitted).  The post-conviction court correctly identified *Strickland* as the Federal law governing these claims (*see id.* at 75–76).  Therefore, Petitioner is entitled to relief only if the state court's adjudication of these claims was contrary to or an unreasonable application of *Strickland* or was based on an unreasonable determination of the facts in light of the evidence.  Respondent argues that the state court determination was correct as to both claims and that the record supports the determination.

The testimony of Ms. Rosenbloom and Ms. Ralleo is summarized in Ground III, *supra*.  Petitioner testified in his own behalf at trial.  His version of events differed

from the two women in several important respects.  Petitioner testified that he went

to Ms. Rosenbloom's house to retrieve a ring he had given her (Ex. C at 436–38).  Ms.

Rosenbloom claimed the ring was at the bank, but she refused to go get it or allow him

to follow her to the bank.  Petitioner testified that he was never asked to leave Ms.

Rosenbloom's home and that he waited in the foyer when Ms. Rosenbloom retreated

to her bedroom (*id.* at 443–44).  At some point Petitioner realized that either Ms.

Rosenbloom or her boyfriend, Joe, had called 911.  Shortly thereafter Petitioner

opened the garage door to let his dog out, and he saw a police officer with a gun

drawn.  Petitioner testified that he was not sure that this officer was at the home as a

result of the 911 call (*id.* at 445).  Petitioner testified that after seeing the police

officer, he went back to Ms. Rosenbloom's bedroom and walked in the door.  He

denied that he kicked the door in, testifying, "I turned the lever and walked in" (*id.* at

446).

Petitioner recounted that all of a sudden the front door exploded and a group of

officers came in (*id.* at 450–53).  It was only at that point, according to Petitioner, that

he pulled out his gun.  Petitioner denied that he was using Ms. Rosenbloom as a shield

and testified that he held his gun behind his back (*id.* at 454–55).  He stated that his

"arm was around [Ms. Rosenbloom] but she—as far as holding her, no, I'm—she

knows that I wasn't squeezing her" (*id*. at 455). Petitioner testified that there was a lot of yelling, and he was convinced that the police were going to kill him. When asked why he believed that, Petitioner responded that the deputies were yelling that they were going to kill him, so "[b]ased on what they were screaming, I thought we were gonna die because they said that's what they were gonna do" (*id.* at 456). Petitioner stated that he had no intention of hurting anyone, but he was afraid that if he moved or released the gun, he would be shot (*id.* at 457–58). Petitioner explained to one officer, Deputy Hendershott, whom he described as the calm one, that he came to retrieve a ring. Once Deputy Hendershott retreated, Petitioner testified that the remaining police officers started yelling again. He stated that he did not have his gun pointed at anyone and that it was behind his back. When asked about his intentions with the gun, Petitioner testified:

> I really didn't have any intentions. It was just—I think it's more or less—I wouldn't even say—I think it was just an instinctive thing. I was—I was scared. They were saying—I could hear them talking about head shot, head shot, head shot, head shot. I remember—I remember—I can still smell [Ms. Rosenbloom's] hair. I remember talking to her and asking—I remember asking her what the hell Joe or her [sic] could have said that could have brought them like that that day. And I told her—and she's—I remember her telling them, "Don't do this, don't do this. I'm not doing this. I'm not pressing charges." And I remember telling her that "They're not gonna let me leave."

(*Id*. at 460–61).

Petitioner testified that the deputies fired their guns first and Petitioner grabbed Ms. Rosenbloom and got into the bathroom for cover.  At this point Petitioner was stunned.  More shots were fired, by both police and Petitioner, resulting in Ms. Rosenbloom being shot and his being shot in the arm.  Petitioner claims he shot at the officers "[t]o make them stop shooting at us" (*id*. at 466).  At some point Deputy Hendershott returned and spoke with Petitioner in an effort to diffuse the situation. Ultimately, Petitioner released Ms. Rosenbloom and surrendered his weapon.  When asked why he did not release Ms. Rosenbloom earlier Petitioner stated that he "honestly can't answer that" and that the situation was "just unbelievable" (*id*. at 468–69).  Petitioner testified that it was never his intent to hurt Ms. Rosenbloom.  He testified that he shot at the deputies because "[t]hey just took off.  They just—it sounded like a machine gun.  They just took off and they shot her.  And she said she was hit multiple times, and all I could think about was to do something to stop it, that's all.  I know that's not a good excuse, but it is what it is" (*id*. at 469–70).

On cross-examination, Petitioner testified that he did not use Ms. Rosenbloom as a shield or hold her hostage.  He stated that Ms. Rosenbloom "wasn't a hostage in my mind, no" and "that wasn't my intent" (*id*. at 504).  While Petitioner stated that he was not using Ms. Rosenbloom as a human shield, he did acknowledge that he held

Ms. Rosenbloom to the side and in front of him and that although she was shot five times, he was hit only once in the hand. Petitioner denied pulling out his gun before the police arrived (*id*. at 494). He claimed that he was carrying the gun because his brother, who lived in Mississippi, had threatened his life (*id*. at 494–95). Petitioner did, however, acknowledge that he did not release Ms. Rosenbloom when asked to do so by the police. When asked why he did not put his gun down when he was asked to do so, Petitioner stated, "I wasn't given that opportunity" (*id*. at 496). When asked why he did not release Ms. Rosenbloom during the lull after the shots, Petitioner testified, "I didn't say no. What I said was—I believe I asked [Deputy Hendershott]—or said a statement to the fact that, 'When I release her, y'all are gonna kill me'" (*id*. at 508). Petitioner admitted to shooting at Deputy Cassady probably more than once but testified, "I was just trying to stop the people that were shooting through the wall from both sides of the doorframe shooting us" (*id*. at 515). Petitioner testified that he was not trying to murder Deputy Cassady.

On redirect examination, Petitioner was asked if he shot at the deputies for the same reason they shot at him. Petitioner responded:

> All I know is it was just crazy. Because all of a sudden, both sides of the doorframe just exploded in sheetrock dust. And I know I remember hearing J saying, "They're shooting through the walls." And I know that—I felt something hit the hat I had on and took it off my head. And

> then she said she was hit again.  So the wall over the—over the toilet,
> which would be covering the vanity area, that was directly at us in the
> head, and I just wanted that to stop coming through the wall at us, yeah.

(*Id*. at 516).  Petitioner testified that he thought they were going to die, and he moved

Ms. Rosenbloom from the vanity to the tub area to protect her from being shot by

Deputy Cassady again.  Petitioner stated that his intention was "to get us out of their

fire when they just opened up on us standing at the vanity" (*id*. at 517).

Part of the defense's strategy was to argue that there was no kidnapping of

either Ms. Rosenbloom or Ms. Ralleo.[8]  In his reply Petitioner puts this theory

succinctly:  "there's absolutely no hint of testimony whatsoever that at any time

during this period of time was Ms. Rosenbloom's liberty restrained in any way, shape,

form, or fashion, nor was that even Petitioner's intent" (ECF No. 55 at 5).  Petitioner

argues that Ms. Rosenbloom was free to exit her bedroom at any time but that she

voluntarily chose to remain with Petitioner.  During the defense closing, counsel

argued that there was no kidnapping, but even if the jury determined that there was a

---

[8] The trial court instructed the jury that a kidnapping is defined by Florida law as follows:

Forcibly, secretly or by threat, confining, abducting, or imprisoning a person against
their will, without lawful authority, with intent to:
Hold for ransom or reward or as a shield or hostage, or inflict bodily harm upon or
to terrorize the victim or another person.

(Ex. C at 658).

Case No.: 3:16cv174/MCR/EMT

kidnapping, they still needed to decide if Petitioner was justified in shooting and argued that the police officers were the ones who created the dangerous atmosphere (*see* Ex. C at 619).

The court instructed the jury on the justifiable use of deadly force as follows:

Justifiable use of deadly force.   An issue in this case is whether the defendant acted in self-defense.  It is a defense to the offense with which Philip Monier is charged if the injury to Chad Brown or Jeremy Cassady or Samuel Parker or Melony Peterson resulted from the justifiable use of deadly force.

"Deadly force" means force likely to cause death or great bodily harm.

The use of deadly force is justifiable only if the defendant reasonably believes that the force is necessary to prevent imminent death or great bodily harm to himself while resisting another's attempt to murder him.

A person is justified in using deadly force if he reasonably believes that such force is necessary to prevent imminent death or great bodily harm of another.

However, the use of deadly force is not justifiable if you find:

1.  Philip Monier was attempting to commit, committing, or escaping after the commission of: Burglary or kidnapping; or

2.  Philip Monier intentionally provoked the use of force against himself, unless:

A.  The force asserted toward the defendant was so great that he reasonably believed that he was in imminent danger of death or great bodily harm and had exhausted every reasonable means to escape the danger, other than using deadly force on Chad Brown or Jeremy Cassady or Samuel Parker or Melony Peterson.

> B.  In good faith, the defendant withdrew from physical contact with Chad Brown or Jeremy Cassady or Samuel Parker or Melony Peterson and clearly indicated that he wanted to withdraw and stop the use of deadly force, but Chad Brown or Jeremy Cassady or Samuel Parker or Melony Peterson continued or resumed the use of force.
>
> A person is not justified in using force to resist an arrest by a law enforcement officer, or to resist a law enforcement officer who is engaged in an exercise of a legal duty, if the law enforcement officer was acting in good faith and he or she is known, or reasonably appears, to be a law enforcement officer.
>
> However, if an officer uses excessive force to make an arrest, then a person is justified in the use of reasonable force to defend himself or another but only to the extent he reasonably believes such force is necessary.
>
> In deciding whether the defendant was justified in the use of deadly force, you must judge him by the circumstances by which he was surrounded at the time the force was used. The danger facing the defendant need not have been actual; however, to justify the use of deadly force, the appearance of danger must have been so real that a reasonably cautious and prudent person under the same circumstances would have believed that the danger would be avoided only through the use of that force.  Based upon appearances, the defendant must have actually believed that the danger was real.

(Ex. C at 671–74).  A review of the record demonstrates that the testimony of Ms. Rosenbloom and Ms. Ralleo directly contradicts Petitioner's claim that there was no kidnapping.  Both testified that Ms. Rosenbloom was held as a shield by Petitioner while he had his gun drawn.  Ms. Rosenbloom and even Petitioner himself testified that he did not release Ms. Rosenbloom throughout his shootout with the officers.

Given the evidence presented at trial, Petitioner cannot credibly argue that no kidnapping occurred.

Whether defense counsel was ineffective by not requesting a specific jury instruction depends on the state law that governed the defendant's trial. *See Williams v. Allen*, 598 F.3d 778, 800–02 (11th Cir. 2010) (in a habeas corpus action, relying on Alabama law to establish whether jury instructions were properly given). Pursuant to Florida law, upon request, a defendant is entitled to a jury instruction on any theory of defense the substantive evidence supports, however weak or improbable his testimony may have been. *See Rockerman v. State*, 773 So.2d 602, 603 (Fla. 1st DCA 2000). However, defense counsel is not ineffective for failing to request a jury instruction that is not warranted by the evidence. *Bertolotti v. State*, 534 So. 2d 386, 387 (Fla. 1988). "Where a defendant asserts self-defense, if the defendant used force that is deadly or nondeadly as a matter of law, the court need only give the applicable jury instruction." *Caruthers v. State*, 721 So. 2d 371, 371 (Fla. 2d DCA 1998). In Florida, the discharge of a firearm has been held as a matter of law to constitute deadly force. *See Miller v. State*, 613 So. 2d 530, 531. (Fla. 3d DCA 1993) ("Firing a firearm in the air, even as a so-called 'warning shot,' constitutes as a matter of law the use of deadly force, that is, the use of a force likely to cause death or great bodily

harm—and is not, as urged, the use of force not likely to cause death or great bodily harm."); *Matthews v. State*, 799 So. 2d 265 (Fla. 1st DCA 2001).

Petitioner cites *Marty v. State*, 210 So. 3d 121 (Fla. 2d DCA 2016), in support of his argument (*see* ECF No. 55 at 7). However in that case, which involved an argument between two neighbors, the court found that it was undisputed that the defendant never fired his gun; "[t]hus, the only self-defense instruction that fits the undisputed facts of this case is an instruction for the justified use of nondeadly force." *Id*. at 125–26. The court found trial counsel ineffective for failing to request an instruction "because the use of nondeadly force was essential to [the defendant's] theory of defense at trial." *Id*. at 127. In this case the undisputed evidence is that Petitioner fired his gun several times, wounding four police officers. Therefore, he was not entitled to a jury instruction on the justifiable use of *non-deadly* force, and his counsel was not ineffective in failing to ask for such an instruction.[9]

Petitioner has also failed to demonstrate that the jury was confused in making the distinction between whether any of the officers were justified "in the use of any force that he reasonably believes necessary to defend himself or another from bodily

---

[9] Even if counsel had performed deficiently in failing to ask for the instruction, Petitioner cannot demonstrate prejudice. The state circuit court found that Petitioner was not entitled to the instruction because "there was no evidence supporting [this] theory of defense," and thus any request for the instruction would have been denied by the trial court.

harm while making an arrest" and whether that force was excessive. *See* Florida Standard Jury Instruction (Crim.) 3.6(h), Justifiable Use of Force by a Law Enforcement Officer. The jury heard the testimony of Ms. Rosenbloom, Petitioner, Deputy Cassady, and other witnesses describing what took place before and after the shootout began. The court instructed the jury on Petitioner's defense of the justifiable use of deadly force in resisting arrest. The jury was instructed that the use of deadly force was not justifiable if Petitioner had committed or was attempting to commit a kidnapping. The jury found Petitioner guilty of kidnapping, and ample evidence presented at trial supports this verdict. Necessarily then the jury would have to determine that Petitioner was not justified in using deadly force in resisting arrest. As found by the post-conviction court, Petitioner's defense theory that he was justified in using deadly force against the officers because they were using excessive force against him is not supported by the record.

The court instructed the jury on the justifiable use of force by a law enforcement officer as follows:

> A law enforcement officer, or any other person he or she has summoned or directed to assist him or her, need not retreat from or stop efforts to make a lawful arrest because of resistance or threatened resistance to the arrest. The officer is justified in the use of any force that he or she reasonably believes necessary to defend himself or herself or another from bodily harm.

Case No.: 3:16cv174/MCR/EMT

> That force is also justifiable when necessarily used—
> 1. In retaking a felon who has escaped, or
> 2. In arresting a felon who is fleeing from justice.
>
> Use of any force by a law enforcement officer or any person summoned or directed to assist a law enforcement officer is not justified if:
> 1. The arrest or execution of a legal duty is unlawful, and
> 2. It is known by the officer or the person assisting him or her to be unlawful.

(Ex. C at 675–76).

Petitioner claims that he returned fire after Deputy Cassady fired the first shot "solely in an attempt to force Deputy Cassady to stop firing his gun at him and Ms. Rosenbloom" (ECF No. 55 at 9). He claims that he was not a threat to anyone and that he did not remove his weapon from his waistband at any time prior to Deputy Cassady's shots. Therefore, Petitioner believes that he was justified in using deadly force in self-defense.

At trial Deputy Jeremy Cassady testified that upon entering Ms. Rosenbloom's home, he and other officers made contact with Ms. Ralleo who was "very upset, screaming, crying, acting hysterical. Screaming please don't let him kill my mother" (*id*. at 128). After Ms. Rolleo was removed from the house for her safety, Deputy Cassady and other police officers proceeded to Ms. Rosenbloom's bedroom where they heard Petitioner and Ms. Rosenbloom "pretty much screaming" (*id*. at 129).

When they entered Ms. Rosenbloom's bedroom, they saw that Petitioner was holding Ms. Rosenbloom in front of himself, and she was hysterical and screaming. Deputy Cassady described the bedroom as cluttered and fairly tight quarters. He immediately began shouting at Petitioner to show him his hands in order to get him to drop any weapon. Petitioner refused and continued to hold Ms. Rosenbloom. Deputy Cassady did not see a gun, but Petitioner informed him that he did have one (*id*. at 134). Deputy Cassady testified that he was concerned for his safety and the safety of the other deputies and Ms. Rosenbloom. When Deputy Cassady took a shot at Petitioner, he and Ms. Rosenbloom fell back into the tub area of the bathroom. Once Deputy Cassady advanced to the doorway of that room Petitioner shot and struck Cassady in the chest right below his sternum (*id.* at 135). Petitioner was still holding Ms. Rosenbloom, which Deputy Cassady described as follows: "[h]e basically mannequined her body. He had her in front of him covering himself with her. She was a much lighter lady and he was a hefty guy so he controlled her and hid behind her pretty much" (*id.* at 136). Deputy Cassady then jumped into the vanity area and was sitting on the vanity when gunshots began coming through the wall. Deputy Cassady was shot in the leg and then realized that his gun had jammed. He got his ankle gun and ran from the vanity in an effort to retreat, firing his weapon as cover. At that point Deputy Cassady was shot again right below his bulletproof vest. He

Case No.: 3:16cv174/MCR/EMT

collapsed and was retrieved by another deputy.  He did not remember anything else until he woke up in the hospital days later.

On cross-examination, defense counsel brought out that Deputy Cassady had just returned to patrol duty four days before this incident and questioned why he did not retreat and call in the SWAT team (*id*. at 140–43).  Deputy Cassady testified that backup was on the way, but that he does not have the opportunity to wait for a hostage negotiator or SWAT if he walks in on something that is "going bad quickly" (*id*. at 147).  Deputy Cassady acknowledged that Petitioner did not have his gun pointed at him and he was not sure whether Petitioner had the gun pointed at Ms. Rosenbloom or not, but if so, he did not see that.  Deputy Cassady also testified that Petitioner did not threaten to hurt him and did not fire his gun until Deputy Cassady had shot his weapon and advanced on Petitioner.  Deputy Cassady also admitted to telling Petitioner that he was going blow his brains out.

On redirect examination, Deputy Cassady testified that it can take a while for SWAT to arrive, anywhere from thirty minutes to an hour, and he was not going to wait given the circumstances (*id*. at 160).  Deputy Cassady explained his actions as follows:

> Q. [Assistant State Attorney Jensen]: When you took the shot at this defendant, did you feel like you had to protect yourself?
> A. [Deputy Cassady]: Yes.

Q.  Did you feel like you had to protect your fellow deputies?
A.  Yes.
Q.  Did you feel like you had to protect Ms. Rosenbloom?
A.  Yes.
Q.   Prior to the shot that you took, did you give this defendant every
opportunity to drop that gun?
A.  Yes.
Q.  Did he?
A.  No.

(*Id*. at 161).  Deputy Cassady testified that even though Petitioner did not verbally

threaten to shoot him, he did create a risk to him and to Ms. Rosenbloom.  Deputy

Cassady testified, "it only takes seconds for him to raise [the gun] up and pull the

trigger" (*id*. at 162).

Petitioner does not cite the special instruction he alleges his counsel should

have requested in his habeas petition.  However, he proposed the following special

instruction in his 3.850 motion:

> You must decide whether the deputies' use of force was reasonable from
> the perspective of a reasonable officer facing the same circumstances
> that the deputies faced.  You must make this decision based on what the
> officer knew at the time of the arrest, not based on what you know now.
> In deciding whether the deputies use of force was unreasonable, you
> must not consider whether the deputies intentions were good or bad.

(Ex. H at 61).  Petitioner argues that if the officers' use of force had been judged by

a "reasonable person" standard, the jury would have found that the officers used

excessive force, so his return of gunfire was justified.

Case No.: 3:16cv174/MCR/EMT

The post-conviction court found that the instruction given was proper.  A review of the record supports this determination.  Deputy Cassady testified about his state of mind in connection with Petitioner's actions and behavior throughout the episode.  He testified that Petitioner was using Ms. Rosenbloom to shield himself from them, and Petitioner admitted to him that he had a gun which he refused to drop. Deputy Cassady testified that he was concerned for Ms. Rosenbloom's safety and the safety of himself and the other deputies.  He also testified that it would only have taken Petitioner seconds to raise his gun and shoot Ms. Rosenbloom or one of the officers. Petitioner has not shown that under the facts of this case the court improperly instructed the jury on the justifiable use of force by law enforcement officers or that his counsel was ineffective for failing to object to that instruction.

As to the proposed special jury instruction, Petitioner has not demonstrated that Florida law required that the use of force by the officers be judged by an objective standard in his case.  Petitioner argues that an objective standard is applied in an unrelated Florida statute, section 776.05, which deals generally with law enforcement officers' use of force and liability for use of excessive force in connection with making an arrest and in related Federal civil cases under 42 U.S.C. § 1983.  *See Tennessee v. Gardner*, 471 U.S. 1 (1985) (holding that apprehension by the use of deadly force is a seizure subject to the reasonableness requirement of the Fourth

Amendment). In *Gardner*, the Court held that a Tennessee statute was unconstitutional insofar as it authorized the use of deadly force against a fleeing suspect who posed "no immediate threat to the officer and no threat to others." *Id*. at 11. However, the court held that "[w]here the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force." *Id*. The Court has held that an objective reasonableness standard should be used in analyzing whether the use of deadly force constitutes excessive force in violation of the Fourth Amendment, to wit: "the 'reasonableness' inquiry in an excessive force case is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham v. Connor*, 490 U.S. 386, 397 (1989). Fla. Stat. § 776.05 is inapplicable to Petitioner's case. Therefore, Petitioner was not entitled to a special instruction under the facts of his case, and his counsel was not ineffective in failing to request one.

In sum, Petitioner has not demonstrated that the state court's adjudication of the claims raised herein in Ground Four or Five was contrary to or an unreasonable application of *Strickland* or was based on an unreasonable determination of the facts

in light of the evidence.  Accordingly, Petitioner is not entitled to habeas relief on these grounds.

Ground VI:  Ineffective Assistance of Counsel: "Failure to Properly Cross-Examine Officer Cassady Concerning His Prior Disciplinary Records/Complaints in Order to Establish Bias"

In his sixth ground for relief, Petitioner alleges that his counsel failed to investigate and cross-examine Deputy Cassady on any prior history of excessive use of force complaints made against him (ECF No. 7 at 18).  Petitioner alleges that he was prejudiced by this failure because he could have shown that Deputy Cassady was biased or prejudiced and this evidence would have given the jury a reasonable basis to discredit his testimony.

    1.      Clearly Established Supreme Court Law

The *Strickland* standard, set forth *supra*, governs this claim.

    2.      Federal Review of State Court Decision

Petitioner exhausted this claim in state court.  The post-conviction court denied relief, and the First DCA per curiam affirmed the denial. The state circuit court adjudicated the claim as follows:

> Defendant alleges that his attorney was ineffective in failing to cross-examine Deputy James Cassady regarding alleged prior complaints of excessive force.  Deputy Cassady testified that he was working on October 29, 2010, when he was dispatched to Ms. Rosenbloom's home.  As the deputy entered the home, he initially made contact with Ms.

Ralleo.  After securing Ms.  Ralleo's safety, the deputy then walked into the bedroom with his gun drawn.  Deputy Cassady said he saw Defendant holding Ms. Rosenbloom in front of him and "screaming at everybody."  Ms. Rosenbloom was scared and also screaming, according to the deputy's testimony.

Deputy Cassady said he told Defendant to drop his weapon and to show his hands.  Deputy Cassady said that he was concerned for his safety as well as the other deputies with him.  Deputy Cassady said he then shot at Defendant.  Defendant returned fire at Deputy Cassady, shooting him in the chest.  Defendant continued to hold Ms. Rosenbloom in front of his body.  As Deputy Cassady retreated, he was shot again by Defendant.  At that point, he "collapsed" and later woke up in the hospital.

The court finds that any attempt to introduce evidence of prior bad acts would have been inadmissible character evidence.  Character evidence is inadmissible to prove a person acted in conformity with that character trait pursuant to section 90.404(1), Florida Statutes, and similar fact evidence is inadmissible when relevant only to prove bad character or propensity.  Since the alleged prior bad acts of Deputy Cassady would have been inadmissible character evidence had counsel introduced them, the court finds this claim must be denied.

(EX. H at 77-78) (citations omitted).  The post-conviction court correctly identified *Strickland* as the Federal law governing this claim (*see id.* at 75–76).  Therefore, Petitioner is entitled to relief only if the state court's adjudication of this claim was contrary to or an unreasonable application of *Strickland* or was based on an unreasonable determination of the facts in light of the evidence.  Respondent argues that the state court determination was correct and that the record supports the determination.

While Petitioner does not elaborate on Deputy Cassady's alleged prior history of excessive force complaints in his habeas petition, he described them as follows in his 3.850 post-conviction motion:

> 1) Incident # 250261 Date: 11-20-07: Judith Nuuhiwa—handcuffed and lifted by handcuffs taken outside; Herbert C. Foreman—in boxers was kicked in back by Deputy Jeremy Cassady and forced onto floor—Cassady Exonerated
> 2) Incident # 35580 Date 2-17-08 Atrice (Tanya) Hill—Ms. Hill said 10-15 officers and K9 (Astro) beat him (unnecessary force) Jeremy Cassady involved)—All exonerated

(Ex. H at 65).  In his post-conviction motion Petitioner alleged that he asked his trial counsel about bringing these complaints up at trial and his counsel responded, "'we don't want to look like [we're] putting the deputies on trial'" (*id.*).

While a defendant in a criminal case has a right to cross-examine a prosecution witness to show bias or motive to be untruthful, that right has limits.  *See State v Bullard*, 858 So. 2d 1189, 1191–92 (Fla. 2d DCA 2003).  Generally, evidence of acts evincing a "person's character or a trait of character is inadmissible to prove action in conformity with it on a particular occasion."  Section 90.404(1), Fla. Stat. (2009); *see Savage v. State*, 99 So. 3d 1001, 1002–03 (Fla. 1st DCA 2012).

Petitioner wanted to impeach Deputy Cassady with prior complaints of excessive force solely to show that he acted with excessive force in his case.  This improper use of character evidence is prohibited by Fla. Stat. 90.404(1).  Given that

evidence regarding these prior incidents would have been inadmissible under Florida law, a reasonable defense attorney could have decided against bringing them up on cross-examination.  Petitioner's defense theory was that it was the law enforcement officers who caused him to fire his weapon in self-defense.  However, his counsel's response that they did not want to appear to put the deputies on trial evidences counsel's opinion that it would not be in the defense's best interest to employ a strategy which attacked the deputies' characters.  Such a strategy may well have backfired,  particularly given the very serious injuries sustained by Deputy Cassady. In addition, as a practical matter, Deputy Cassady was exonerated in both incidents cited by Petitioner, so these incidents do not prove that he had a history of using excessive force.

More important, Petitioner cannot show how he suffered prejudice from his counsel's decision not to offer inadmissible character evidence in this case.  *See State v. Bullard*, 858 So. 2d at 1191-92 ("Courts have allowed cross-examination on Internal Affairs investigations where the investigation arose from the same incident as the defendant's criminal charges or, if a defendant claims an officer used excessive force,  investigations involving prior incidents of excessive force, but they have refused to allow such evidence when the investigation is completely unrelated to the defendant's case.").  After Deputy Cassady  fired his weapon, Petitioner engaged in

a shootout which resulted in his injuring four deputies.  While Petitioner claims that

he was only acting in self-defense, the evidence presented in the case does not support

this theory. *Compare Joseph v. State*, 976 So. 2d 1204 (Fla. 4th DCA 2008) (in a trial

for resisting with violence, the defendant's right of cross-examination included the

right to question police officers as to whether they had prior use of force complaints

lodged against them, even though the prior complaints against the officers were

unsubstantiated, where the defendant alleged being pushed into a trash can with no

provocation on the defendant's part, and that the defendant made no move toward the

officers).

Petitioner has not demonstrated that  the state court's adjudication of this claim

was contrary to or an unreasonable application of *Strickland* or was based on an

unreasonable determination of the facts in light of the evidence.  Accordingly,

Petitioner is not entitled to habeas relief on this ground.

Ground VII:        Ineffective Assistance of Counsel: "Failure to Request a Ruling on
                   Petitioner's Motion for a Change of Venue"

In his final claim for relief, Petitioner argues that due to the facts of the crime,

including that one officer was seriously injured and three others were shot, the case

became a "media frenzy" (ECF No. 7 at 20).  Petitioner states that in the weeks and

months following the crime "hundreds of articles and blogs, as well as numerous

television and radio news updates, detailed the events of what transpired between Petitioner and the four officers," including the allegedly erroneous information that Petitioner was the first shooter (*id*.). The defense sought a change of venue because there were concerns about finding a fair and impartial jury in Escambia County, Florida. As discussed in Ground I, *supra*, the trial court never ruled on the motion for a change of venue. Petitioner alleges that his counsel was ineffective for failing to obtain a ruling on the motion.[10]

1.    Clearly Established Supreme Court Law

The *Strickland* standard, set forth *supra*, governs this claim.

2.    Federal Review of State Court Decision

Petitioner exhausted this claim in state court. The post-conviction court denied relief, and the First DCA per curiam affirmed the denial. The state circuit court adjudicated the claim as follows:

> Finally, Defendant alleges that his attorney erred in failing to request a change of venue, thereby depriving him of a fair trial. For purposes of

---

[10] In Petitioner's reply he asks that this claim "be properly construed as a claim that trial attorney was ineffective for allowing Catherine Jehl [*sic*] to be seated as a juror . . . . in light of the marriage between a motion for a change of venue and attempting to select an impartial jury" (ECF No. 55 at 12). The court will not consider a claim that was not raised in Petitioner's amended habeas petition. Petitioner has not sought leave to amend his petition to add this claim, and because this claim does not relate back to any claim asserted in the amended petition, any new claim would be untimely and the amendment would be futile. *See* Fed. R. Civ. P. 15(c)(1)(B); *Mayle v. Felix*, 545 U.S. 644, 664 (2005).

ineffective assistance of counsel, the issue for the Court to consider is whether a change of venue was proper and whether counsel would have been successful had he moved for a change of venue.

The test for determining whether to grant a change of venue is whether the inhabitants of a community are so infected by knowledge of the incident and accompanying prejudice, bias and preconceived opinions that jurors could not possibly put these matters out of their minds and try the case solely on the evidence presented in the courtroom. In exercising its discretion regarding a change of venue, a trial court must make a two-pronged analysis, evaluating: (1) the extent and nature of any pretrial publicity; and (2) the difficulty encountered in actually selecting a jury.

The Court has examined the voir dire in this case and finds that Defendant had a fair and impartial jury that was not prejudiced by media coverage. Since a change of venue would not have been granted and Defendant had an unbiased jury, this claim is denied.

(Ex. H at 78–79) (citations omitted). The post-conviction court correctly identified *Strickland* as the Federal law governing this claim (*see id.* at 75–76). Therefore, Petitioner is entitled to relief only if the state court's adjudication of this claim was contrary to or an unreasonable application of *Strickland* or was based on an unreasonable determination of the facts in light of the evidence. Respondent argues that the state court determination was correct and that the record supports the determination.

The Sixth Amendment of the United States Constitution guarantees to a defendant the right to be tried by an impartial jury whose verdict is "based on evidence received in open court, not from outside sources." *Sheppard v. Maxwell*,

384 U.S. 333, 351 (1966). The failure to give an accused a fair hearing violates

standards of due process. *Irvin v. Dowd*, 366 U.S. 717, 722 (1961). When pretrial

publicity or an inflamed community atmosphere precludes the seating of an impartial

jury, a change of venue or a continuance is required. *See Rideau v. Louisiana*, 373

U.S. 723 (1963), *Sheppard v. Maxwell*, *supra*. However, due process does not require

that qualified jurors be totally ignorant of the facts and issues involved in a case. *See*

*Murphy v. Florida*, 421 U.S. 794 (1975). As stated in *Irvin*, 366 U.S. at 723:

> To hold that the mere existence of any preconceived notion as to the
> guilt or innocence of an accused, without more, is sufficient to rebut the
> presumption of a prospective juror's impartiality would be to establish
> an impossible standard. It is sufficient if the juror can lay aside his
> impression or opinion and render a verdict based on evidence presented
> in court.

When deciding the question of whether a defendant was denied a fair trial due

to an impartial jury a court must consider both presumed and actual prejudice to the

defendant. *See Coleman v. Zant*, 708 F.2d 541, 544–45 (11th Cir. 1983); *Meeks v.*

*Moore*, 216 F.3d 951, 961 (11th Cir. 2000). The Eleventh Circuit Court of Appeals

has defined presumed prejudice as follows: "'where a petitioner adduces evidence of

inflammatory, prejudicial pretrial publicity that so pervades or saturates the

community as to render virtually impossible a fair trial by an impartial jury drawn

from that community, '[jury] prejudice is presumed and there is no further duty to

establish bias.'" *Coleman*, 708 F. 2d at 544 (citing *Mayola v. Alabama*, 623 F.2d 992,

997 (5th Cir. 1980)).   The test is whether "'an unacceptable risk is presented of

impermissible factors coming into play.'" *Woods v. Dugger*, 923 F.2d 1454 (11th Cir.

1991) (quoting *Holbrook v. Flynn*, 475 U. S. 560, 570 (1986)). The presumptive

prejudice standard is "rarely" applicable and is reserved for an "extreme situation";

thus the petitioner's burden is an extremely heavy one. *Coleman v. Kemp*, 778 F.2d

1487, 1537 (11th Cir. 1985) (citing *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 554

(1976)); *Woods*, 923 F.2d at 1459.   The issue of presumed prejudice is a mixed one

of law and fact. *Irvin*, 366 U.S. at 723.   A reviewing court must examine the "totality

of the circumstances" in evaluating the fairness of a petitioner's trial in light of pretrial

publicity. *See Sheppard*, 384 U.S. at 352.

Actual prejudice exists when two prerequisites are satisfied:

First, it must be shown that one or more jurors who decided the case
entertained an opinion, before hearing the evidence adduced at trial, that
the defendant was guilty.  Second, these jurors, it must be determined,
could not have laid aside these preformed opinions and "render[ed] a
verdict based on the evidence presented in court."

*Coleman*, 708 F.2d at 544 (citing and quoting *Irvin*, 366 U.S. at 723).  The Court in

*Irvin* elaborated on the issue of actual prejudice as follows:

It is not required, however, that the jurors be totally ignorant of the facts
and issues involved.  In these days of swift, widespread and diverse
methods of communication, an important case can be expected to arouse

> the interest of the public in the vicinity, and scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case. This is particularly true in criminal cases. To hold that the mere existence of any preconceived notion as to the guilt or innocence of the accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.

*Id*. at 722–23. A reviewing court must look to the totality of the circumstances to determine whether actual prejudice exists. *Murphy v. Florida*, 421 U.S. at 799. A trial court's findings of impartiality may be overturned only for "manifest error." *Patton v. Yount*, 467 U.S. 1025, 1031 (citing *Irvin*, 366 U.S. at 723). To prevail on a claim that his counsel was ineffective for failing to request, or in this case, obtain a ruling on a motion for a change of venue, a petitioner must show at a minimum that "there is a reasonable probability that the trial court would have, or at least should have, granted a motion for a change of venue if [petitioner's] counsel had presented such a motion to the court." *Meeks*, 216 F.3d at 961; *see Griffin v. State*, 866 So. 2d 1, 12 (Fla. 2003) (to establish *Strickland* prejudice a petitioner must show reasonable probability that the trial court would or should have granted the motion).

The following jurors were seated in Petitioner's case: Anne Baehr, Kimberly Franklin, Robert Klemm, Charles McClain, Catherine Jehle, George Kuninger, Hilda Colombardo (alternate) and Olivia Black (alternate) (Ex. C at 412–13). The record

reflects that at the beginning of voir dire the trial court asked if any of the prospective jurors had any personal knowledge of the case or had heard or read anything about the case from the news media (*id*. at 258–59). Thirteen prospective jurors indicated that they had read or heard about the case (*id*. at 258–60). The trial court informed those with knowledge of the case that they would be questioned individually in the jury assembly room.

Mr. Hawkins was questioned first, and when asked about his knowledge of the case, he stated that he had read the newspaper headline that morning and recalled that the incident occurred a mile or so from his home (*id*. at 263). When the crime first happened, he knew someone who lived in Ms. Rosenbloom's neighborhood, so they drove by her home. He also recalled the circumstances from news reports, but he did not elaborate. Both parties stipulated to his being challenged for cause after he stated that he "couldn't swear to you that I'd sit there like a blank slate and all of a sudden everything comes in there and it's like nothing else has been affected. Because I do have some strong feeling about violence and--" (*id.* at 264).

Synthia Smith said that she read about the case in the newspaper, describing the case as involving "[a] robbery, guns. I think they were Hispanic. It seems like there was like three or four of them. That's what I read on the news" (*id*. at 268). She stated that she would be able to put aside anything she read and it would not interfere

with her sitting on the case; however, she informed the court that she had a personal emergency and needed to be excused (*id*. at 268–70).  The parties stipulated to striking her for cause.

Ann Rudi stated that she did not pay close attention to the case, but "I know that it was a home invasion and there was police officers shot.  And working in the hospital, we think we went on alert that day saying that there was a home invasion, be prepared.  That's all I know about it" (*id*. at 270–71).  She also testified that she may have read something else about it later, but she felt she could set that aside and base her verdict on the facts of the case and the law.

Mr. Werner indicated that when the incident happened "it was pretty much all over the news" and he had an interest in the case because he saw that police officers were involved (*id*. at 279).  He also responded, however, that he does not believe everything he reads in the newspaper because he has a background in journalism.  Mr. Werner answered that "[w]ithout a doubt" he could set aside anything he had heard about the case and be impartial (*id*. at 280).  He also indicated that he used to play a lot of men's baseball so he played with a lot of police officers, but he did not know any of the officers who were involved.  The defense wanted to strike Mr. Werner for cause but the court denied the strike based on his statements and facial expressions (*id*. at 286).

Case No.: 3:16cv174/MCR/EMT

Ms. Jehle described her knowledge of the case as follows: "[t]hat it was up on Scenic—up the Scenic Highway, and they responded to, I think, to a domestic call. And when they entered, they were shot at; that he—one of the officer was—had a lot of medical problems since then" (*id*. at 287). Ms. Jehle stated that she would do her best to set this knowledge aside and to be impartial, and she felt that she could do that (*id*. at 288).

Ms. Perdue indicated that the crime was on television and in the newspapers. She recalled that the situation appeared to be a hostage situation and that police officers and a women were shot. Ms. Perdue stated that the part she had been following concerned the officer's health issues and transplants after the shooting. However, Ms. Perdue stated that she could set this knowledge aside and follow the law. She also knew the defense attorney but this would not affect her verdict (*id*. at 291–93). Neither party challenged Ms. Perdue.

Judy Hamilton stated that she had been following the case in the newspaper and on television, and there had been updates on the case on both television and in the newspaper on that morning, including information on the officer who had been badly injured. She stated, "[o]f course, when it happened, it's been on the news and on the TV, they show film. Of course they showed film today. Then they had a big writeup in the Pensacola News Journal" (*id*. at 294). Ms. Hamilton indicated that she had

already formed an opinion about the case and it would be very hard to set that aside. Ms. Hamilton was excused for cause.

Brittany Thornton stated that the case had been in the news recently and that she believed the defendant was dating or had dated Ms. Rosenbloom and had held her at gunpoint and that three officers were shot (*id.* at 296–97). She testified that she could set that knowledge aside and be an impartial witness. Neither party challenged Ms. Thornton for cause.

Michele Frary stated that she had heard that an officer had been shot some time ago. She stated that she does not listen to the news or read the newspaper "but when it hit Pensacola, we were just made aware of the fact that officers had been shot" and her only interest was whether the officer lived (*id.* at 299). She stated that she could absolutely decide the case based on the facts and evidence and that she had not formed any opinions on the case. Neither party challenged Ms. Frary for cause.

Lisa Blackwell stated that she'd "heard about Phillip. He went to, like, a home—or had, like, a charge for home invasion and shot, I think, three officers. And I just heard about it because I live near Baywinds" (*id.* at 302). She heard this from the internet and friends when it happened. Ms. Blackwell stated that she could set aside this knowledge and decide the case on the facts and law. Neither party challenged Ms. Blackwell for cause.

Case No.: 3:16cv174/MCR/EMT

Anthony Colson stated he had read about the case in the newspaper that very morning. He stated that he remembered "seeing something about Mr. Cassidy [*sic*] where he was going through the rehab and that was some time last year. And [he] didn't remember the specifics of any of it" (*id*. at 307). Mr. Colson stated that he had not formed any opinion about the guilt or innocence of Petitioner. Mr. Colson was not challenged for cause.

Sheila Edwards stated as follows regarding what she had heard about the case: "[m]ost of what I've read and heard about is the man was holding his girlfriend captive. And so the police responded, and he shot and injured one police officer. And I believe he attempted to shoot at some others and injured the girlfriend, as well" (*id*. at 308). Ms. Edwards testified that she could set aside what she'd heard previously and decide the case on what she heard in court. Neither party challenged Ms. Edwards for cause.

Finally, Nancy Windham stated that she witnessed police cars the day of the incident and looked the next day to see what had happened. Other than that, she had heard things about Officer Cassady who was shot but that he was doing better (*id*. at 311–12). Ms. Windham testified that she could set this knowledge aside and be an impartial juror.

After questioning these prospective jurors separately, voir dire continued with the entire panel.  During this process, one prospective juror, Mr. Chiki, indicated that he needed to speak with the court.  He stated that after being asked whether anyone recognized Petitioner or if anyone had seen any news coverage, Mr. Chiki realized "after seeing his face and finding out who he was, yes, I do remember seeing him in the news" (*id*. at 383).  Mr. Chiki primarily just remembered Petitioner's face and stated, "I just remember seeing him on the news and hearing a little bit about the shooting and all that.  I didn't know how far in depth it went" (*id*. at 385).  Mr. Chiki indicated that this would not affect his ability to sit as an impartial juror; however, he also indicated that he had a potential work conflict, so the parties agreed to strike him for cause.

Also at some point during the voir dire, Ms. Jehle indicated that she wished to discuss something outside of the rest of the venire.  She stated, "I just want to make sure it's noted on there that I am friends with—one of my friends is married to a police officer who does know some of the officers in this case.  But it wouldn't affect me being fair and impartial.  I just wanted to make sure that, that was noted" (*id*. at 394–95).  Defense counsel asked her if her friend had discussed Deputy Cassady's condition or circumstances surrounding the case.  Ms. Jehle responded, "[s]he's mentioned that he's had some health problems in trying to get a liver or something

like that, but that's it" (*id*. at 395). She indicated that she had never met Deputy Cassady and when asked if she had formed any opinions about the case stated, "[n]o. I don't know much about the circumstances at all" (*id*.). Neither side moved to strike Ms. Jehle.

There were fifty prospective jurors in the venire panel (*see id*. at 314). Of these, fourteen had heard some information about the case from the news media. However, in reviewing the information that these prospective jurors heard or read, there is no indication that the media coverage contained anything other than factual information. Petitioner has not established that the jury pool was tainted by an atmosphere of hostility. *Compare Coleman*, 778 F.2d at 1538–39[11]; *Rideau*, *supra* (requiring a change of venue where the defendant's confession to robbing a bank, kidnapping three of the bank's employees, and killing one of them was videotaped and broadcast three times by a local television station which were seen respectively by 24,000, 53,000,

---

[11] The *Coleman* case involved a notorious murder by three escaped convicts who killed six members of the Alday family in a small community in Georgia. In *Coleman*, the Eleventh Circuit noted "there was publicity that was either calculated to provoke hostility or reflective of an atmosphere of hostility; including, *inter alia*, the 'precook' and other egregious remarks by the county's chief law enforcement officer, Sheriff White; the newspaper description of the defendants as smirking and other characterizations of remorselessness and other derogatory characterizations; the remarks of the defendants' own mother suggesting that mercy was inappropriate; the efforts and statements of numerous attorneys to avoid appointment, both reflecting their assessment of the community atmosphere and aggravating same; and the direct testimony of several residents and newsmen, whose job included assessment of the community atmosphere, to the effect that the community had prejudged the case." 778 F.2d 1487, 1538–39.

and 29,000 people in the community).  *See also Murphy v. Florida*, 421 U.S. at

800–01 (affirming denial of habeas relief based on actual prejudice claim and stating,

"[t]he voir dire in this case indicates no such hostility to petitioner by the jurors who

served in his trial as to suggest a partiality that could not be laid aside."); *Meeks*, 216

F.3d at 961–62 ("[t]he fact that all except one of the jurors in both of Meeks' cases

had been exposed to some pretrial publicity concerning the Walker and Thompson

murders is unavailing because . . . 'the pretrial publicity in this case was essentially

factual and was not so pervasive or insidious as to raise the presumption that any

venireperson exposed to it was rendered incapable of giving [Meeks] a fair trial.'"

(footnote and citation omitted)); *Cummings v. Dugger*, 862 F.2d 1504, 1510–11 (11th

Cir. 1989) (finding no actual prejudice even though eleven of twelve jurors had been

exposed to some degree of pretrial publicity); *Spivey v. Head*, 207 F.3d 1263 (11th

Cir. 2000) ("In contrast to *Coleman* where the trial court had to strike almost one-half

of the prospective jurors who were questioned whether they had formed an opinion

because they had a fixed opinion, here many of the prospective jurors had not heard

anything about the case and most remembered very little, if anything, about it.").

     Although the record is silent as to why Petitioner's counsel did not seek a ruling

on the motion for a change of venue, Petitioner cannot demonstrate ineffective

assistance of counsel in failing to pursue a motion that would not have been granted.

The relative ease of selecting jurors in this case combined with the fact that only one of the jurors selected had heard about the case previously cuts against Petitioner's claim that the case produced a media frenzy such that a fair and impartial jury could not be selected. Also, Petitioner exercised only nine of his ten peremptory challenges which tends to show that defense counsel did not have to settle for jurors which were of concern to the defense (*see id.* at 404). Petitioner has not demonstrated that the trial court would or should have granted the motion for a change of venue, either before trial began or based on the events that occurred during jury selection. Petitioner has not demonstrated that the state court's adjudication of this claim was contrary to or an unreasonable application of *Strickland* or was based on an unreasonable determination of the facts in light of the evidence. Accordingly, Petitioner is not entitled to habeas relief on this ground.

## IV.    CERTIFICATE OF APPEALABILITY

Rule 11(a) of the Rules Governing Section 2254 Cases in the United States District Courts provides that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." If a certificate is issued "the court must state the specific issue or issues that satisfy the showing required by 28 U.S.C. § 2253(c)(2)." 28 U.S.C. § 2254 Rule 11(a). A timely notice

of appeal must still be filed, even if the court issues a certificate of appealability.  28

U.S.C. § 2254 Rule 11(b).

"Section 2253(c) permits the issuance of a COA only where a petitioner has

made a 'substantial showing of the denial of a constitutional right.'"  *Miller-El v.*

*Cockrell*, 537 U.S. 322, 336, 123 S. Ct. 1029, 154 L. Ed. 2d 931 (2003) (quoting

§ 2253(c)(2)).  "At the COA stage, the only question is whether the applicant has

shown that 'jurists of reason could disagree with the district court's resolution of his

constitutional claims or that jurists could conclude the issues presented are adequate

to deserve encouragement to proceed further.'"  *Buck v. Davis*, 580 U.S.—, 137 S. Ct.

773 (2017) (citing *Miller-El*, 537 U.S. at 327).  Here, Petitioner cannot make that

showing.  Therefore, the undersigned recommends that the district court deny a

certificate of appealability in its final order.

The second sentence of Rule 11(a) provides:  "Before entering the final order,

the court may direct the parties to submit arguments on whether a certificate should

issue." Thus, if there is an objection to this recommendation by either party, that party

may bring this argument to the attention of the district judge in the objections

permitted to this report and recommendation.

Accordingly, it is **ORDERED**:

That Petitioner's Motion to Correct an error in his habeas petition (ECF No. 56) is **GRANTED only to the extent** that the court considers the error corrected.  The motion is denied in all other respects, as Petitioner has not shown good cause for the other relief requested, and such relief would have no effect on the undersigned's recommended disposition of Ground VI of the instant petition.

And it is respectfully **RECOMMENDED**:

1.      That the amended petition for writ of habeas corpus (ECF No. 7) be **DENIED**.

2.      That a certificate of appealability be **DENIED**.

At Pensacola, Florida, this 26th day of November 2018.


/s/ *Elizabeth M. Timothy*
**ELIZABETH M.  TIMOTHY**
**CHIEF UNITED STATES MAGISTRATE JUDGE**


## NOTICE TO THE PARTIES

**Objections to these proposed findings and recommendations must be filed within fourteen (14) days after being served a copy thereof.  Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.  A copy of objections shall be served upon all other parties.  If a party fails to object to the magistrate judge's findings or recommendations as to any particular claim or issue contained in a report and recommendation, that party waives the right to challenge on appeal the district court's order based on the unobjected-to factual and legal conclusions.  *See* 11th Cir. Rule 3-1; 28 U.S.C. § 636.**

Case No.: 3:16cv174/MCR/EMT